May it please the court, my name is Bobbi Rasmussen, I'm the attorney for the appellant Christine Encinas. I would like to reserve 5 minutes for rebuttal. That's a clock, just keep your eye on it. I would like to emphasize two main points that are also set forth more fully in our brief. The first is that in this case trial court erred in finding that the plaintiff failed to exhaust her claims on hostile environment and on race discrimination. And secondly, the trial court erred in finding there was no issue of fact regarding whether the defendant's reason for firing the plaintiff was a pretext for discrimination. It's not the usual pretext case where the conduct is arguable. What your client did was pretty bad, pretty serious stuff, arguably a crime. I mean I don't know, I don't know criminal law or what this could be, but essentially if I understand it correctly, had she succeeded in doing what she was found to have done, she would have gotten, you know, her friend would have gotten valuable, I guess, electricity for nothing. I understand what you're saying. I mean this could have been over a period of time amounted to hundreds, thousands of dollars of service, you know, going in and falsifying records, changing, I mean this is pretty serious stuff. Well, what she's alleged, Christine Sinus is alleged to have been fired for two reasons. One is her actions allegedly on the Toledo account, that's the name of the customer there, and also based on her work history. And it's our contention that her work history is based upon discriminatory discipline that was handed down over a period of time. And she would not have been fired had it not also been for her work history. In regard to her actions on that Toledo account, she, there's a disputed issue of fact as to whether she intended to make those changes or not. The defendant says she intended it, the plaintiff testified she did not, that what she did was typos, that she made different changes, changes to his name and scrolled down the screen in a certain way so there were changes to the account. There's no evidence. This was a friend of hers, right? Pardon? This was a friend of hers. This was a woman who used to work at TEP, the employer, and was no longer working there. Well, counsel, I think there's no doubt that she did, that her conduct was such which under ordinary circumstances she could have been filed, fired. The only real case that you have is to show that there were many white persons who did worse things who were not fired. That is part of the question. But that's your case and is that enough? Well, we also have more than that. That is part of our case. We have comparators who did very similar things. One who almost did precisely the same thing on her sister's account and was only given a written reprimand and her name was Tonette Russell and she was You say almost. You say almost. Right. It's not, I don't see how any two acts could be identical. Tell us what that other one was. Okay. Tonette Russell, she worked on her sister's account, which is a violation of TEP policy. That's what Chris Macenas is alleged to have done, worked on the account of a friend, a violation of TEP policy. Tonette Russell granted unauthorized credit extensions to her sister when she had bad credit, which was also against TEP policy. Chris Macenas is alleged to have granted a credit extension to this customer. And Tonette Russell's, the outstanding balance there was at least three times more than the amount Chris Macenas was alleged to have created. Both accounts were alleged to be uncollectible based on their actions, but Tonette Russell, a non-Hispanic, received Didn't your client do more? Didn't she actually do it so she wouldn't get charged, your friend wouldn't get charged at all? I'm sorry? Didn't your client do more? Wouldn't, if she succeeded with the changes, wouldn't have kept her friend from being charged at all? If she succeeded, it would have kept, it would have resulted in possibly an outstanding bill of about $121. There's testimony that there's a skip-tracing procedure at TEP that the employees go through, and they had the account holder, which was her father, had his social security number so they could have skip-traced the account and collected on it. So that also is an issue of fact. But in response to Justices Fletcher's comment about the comparators, that is part of our case, an important part. But in addition to that, an important part is the co-worker racial slurs that occurred in this case. Here we have testimony that a co-worker who was a union steward, Judy Neal, observed on a daily basis anti-Hispanic slurs in this same customer service department at TEP. And Judy Neal testified it happened every day. It was a common theme, and there were two different co-workers who she observed saying these anti-Hispanic slurs. And what's important about that, in addition to it being bigoted insults and evidence of discriminatory animus, it is important that it was said out in the open where Judy Neal observed supervisors nearby. And it's her opinion that supervisors must have heard it. They would have heard it because they were nearby. It was within earshot of them. And based on that, TEP had a responsibility, since they knew about these slurs, to take corrective action, but failed to do so. Another important part of this case is that Kristen Steen has complained about Hispanic discrimination to five different supervisors, including the president at TEP, and no corrective action was taken at all. In fact, TEP stated to the investigation agency, the ACRD, Arizona Civil Rights Division, that there were no other complaints of Hispanic discrimination at all. Other employees at TEP also testified that they complained about Hispanic discrimination, but nothing ever happened. Now, the case law says that if an employer knows about discrimination, which clearly there were many, many complaints about it, fails to take corrective action, that they acquiesce in it and, in essence, agree with the discrimination and should be held liable for that, that's strong evidence of discriminatory animus of TEP. Did your client complain about the comments or anything like that? Not about the comments. My client complained about discrimination at TEP, that Hispanics were being scrutinized more closely, disciplined more often and more severely. If she didn't complain about the comments, can we consider the comments? I believe it's evidence of discrimination at TEP, and particularly within her department where she worked. For example, in the case... These were co-worker comments, right? These were co-worker comments, right. Not supervisor comments. Right, right. There's also evidence of a supervisor comment by Vicky Valadez saying those damn Mexicans was her comment, and that is evidence of TEP's discriminatory animus as well. That was kind of hearsay upon hearsay upon hearsay, isn't that right? That comment by the supervisor. Somebody said they heard it and told somebody else that they'd heard it who told somebody else. Right, our client heard it from somebody. Right. I believe it's an exception to hearsay, however, based on admission of a party opponent, because it was made by... The intermediate levels of hearsay. You have to be able to get through every hearsay declared. Maybe the initial one was, but how do you get over the hearsay objection to the... If you have enough levels of hearsay, it becomes rumor rather than hearsay. Right, our argument was initially the person who said it repeated it as an excited utterance, and that was the exception to hearsay. And then the actual statement is an exception to hearsay based on the party opponent. We have the contention that she didn't exhaust her administrative remedies for anything except the termination. Do you want to address that? Yes, thank you. The charge has the box checked, national origin discrimination. However, the charge is broad enough to encompass other claims. This court has stated that charges are to be construed liberally and claims can arise from the charge beyond the actual words of the charge if, in particular, it's based on several factors, which all happen in this case. In this case, you have the same discriminatory scheme alleged, the discriminatory discipline which caused her termination, and the discrimination which is hostile environment, the slurs, the over-scrutinizing of Hispanics, the animosity that occurred in the department, the suspicion against Hispanics. There's all evidence of that, all arising from the same witnesses, the same supervisors, the same time period, the same operative facts. And here not only could have a hostile environment arose from this charge, it did because the ACRD, the Attorney's Civil Rights Division in Arizona, investigated this charge and asked specific questions about hostile environment. I cited in my brief specific testimony of witnesses based on ACRD transcripts that ask, was there an anti-Hispanic environment? Is that supervisor a racist? Is there animosity? There was testimony as to that. So hostile environment clearly arose out of this charge and should have been considered exhausted in this case. Would you save the rest of your time for rebuttal? The one more thing that I wanted to point out, Your Honors, is that what the magistrate judge and the district court did in this case was extensive fact-finding, credibility determinations, and they failed to construe the facts in light most favorable to the plaintiff, even with regard to the actual incident of her termination, her work on the Toledo account. If you construe those in a light most favorable to the plaintiff, you have an issue of fact. What did she do on that account? What did she intend to do? Was it just an error? If it was an error, did it justify termination? And that on top of the evidence that supervisors had complete discretion in how to discipline people and, in fact, evidence that they disciplined Hispanics more severely and harshly, leads to the conclusion that there's certainly an issue of fact regarding whether TEP fired her with discriminatory intent. I will save the rest of my time for rebuttal. Thank you. Thank you. We'll hear from the other side. May it please the Court, my name is Tibor Nagy. I'm here representing Tucson Electric Power Company. With me is my associate, Wade Swanson. He may be addressing the Court to the extent that the Court wants to hear anything about the spoliation issue. Otherwise, I'll be arguing exclusively today. Let me begin by addressing the essentially there are two major issues in this case. The first issue, of course, is the hostile environment question, whether or not it's even before the Court appropriately on the question of exhaustion. And the second issue, of course, is the question of whether or not there was indeed sufficient evidence to overcome the summary judgment on the discrimination claim. Let me begin by saying as far as the exhaustion question is concerned, there's two elements to that issue. One, of course, is was the charge something, did it contain anything in which one could expect that a hostile environment claim would grow out of it? There's no question that the actual document itself, the discrimination charge itself, says nothing about hostile environment or harassment or anything to that effect. And I'm not even here to talk about whether there's a dichotomy or a distinction between race discrimination or national origin discrimination. For purposes of this discussion, we'll dispense with that. We can assume it's either or for purposes of this argument. The bottom line and the distinction here is whether or not it's discrimination versus hostile environment. I guess one of the tests is what, in fact, was investigated. And it seems that in the document that was written up finding that there was reason to go ahead with the suit, that they did raise some of those issues and find that there was discrimination in the workplace. Well, Your Honor, there was, in fact, a finding of fact from the Civil Rights Division. What there wasn't, in fact, what is very distinctly missing from the findings, is any reference whatsoever to a hostile environment claim. The findings exclusively address discrimination only, and they address the question of discrimination as it relates to her termination. Isn't hostile environment a species of discrimination? All the statute prohibits is discrimination. That's correct, Your Honor. And there are various ways to discriminate. And one of them is by having a hostile work environment. So I'm not quite sure I understand how, if they're investigating discrimination, the charges of discrimination, it could have been by firing, it could have been by hostile work environment, it could have been by soliciting sexual favor, which is not in this case, but that's another way of discriminating. I'm a little confused by it. And the answer to that, at least as far as the case law is concerned, is that there is a distinction, not necessarily in the sense that it's not discrimination. Certainly in the broad sense, racial harassment is discrimination the same as sexual harassment or sexual discrimination or religious discrimination. It is not enough to simply bring a charge that says, I hereby allege Title VII discrimination on the basis of race, period. And then try to, from that base, every possible form of discrimination that might come up subsequent to that in discovery three years later after the Civil Rights Division has made a determination and try to bring something forth from that. But why isn't that enough? Let's say you go to the Civil Rights, I guess here she went to the state. Yes. Same thing, right? Same thing. And say, you know, I'm not a lawyer. I don't really quite know what the law says, but I feel they are treating me wrong because I'm Hispanic. Certainly. Here's my story. Why can't a complainant make a complaint that's that broad and have the agency go through and sort through and the lawyers go through and figure out, oh, what she's really saying is hostile environment, you know, put labels on them. But she's complaining about being mistreated and being mistreated on the basis of either race or national origin. You're not going to argue that right now, which I understand. So why isn't that enough? And, in fact, what the agency here did, it sounds to me like they really looked into all the facts. Well, and that's the whole idea. The idea, that's why it's jurisdictional. It is jurisdictional. One has to go to the agency and exhaust the remedies because Congress intended for the agency to have that authority and to give the parties the opportunity to address the specific issues that relate to the discrimination at that level. I don't think you're answering the question I'm asking, which may mean that I'm asking the question. Let me ask it a different way. What is it that the agency, the EEOC, the CAL, EEOC, what is it called, CAL? Oh, in this case, the Arizona Civil Rights Division, Your Honor. I'm sorry, Arizona Civil Rights Division. What is it that they did not look into that they could have looked into or should have looked into had she just phrased her claim more adequately? Give me one fact, one thing that they didn't look into that they could have or should have. Well, that kind of raises an interesting problem with this case, and that is what is the definition of a hostile environment? Answer my question. I'm trying to, Your Honor. We can talk philosophy in a minute. I'd love to, Your Honor. What I would really like to do is I'd like you to point to one fact, one circumstance that you say, gee, if she had just said this, they would have looked at it, but because she didn't, they didn't look at it. What is the one thing? I'll give the one example that we have in the record, and that's the allegation that Vicky Valadez used the words, those damn Mexicans. And if that indeed was some fact of hostile environment that she claimed she was offended by or heard or was aware of, then she should have said something about it. And this is why my response perhaps sounds somewhat. This was not investigated. Absolutely not. Let me read to you out of the findings of fact and conclusions. The evidence established a prima facie case of discriminatory terms and conditions of employment because of national origin in that it showed that the charging party was given reprimands and suspensions for a variety of work-related offenses and that similarly situated non-Hispanics who engaged in the same or similar violations were not similarly disciplined. And then it goes on to say the evidence also established a prima facie case of national origin discrimination with respect to the charging party's termination. So if you read that, it sounds as though they're finding that there was a hostile working environment for Mexicans and that this resulted in all sorts of over-supervision and unfair discipline. And then also that she was terminated. Now, isn't that enough to bring everything in? Your Honor, I respectfully disagree. I don't believe that that's a finding of a hostile working environment. It doesn't equate to the definition of a hostile working environment. What the agency found there and what the language very clearly says was is that they found that there was other evidence of disparate treatment, nothing more. And that's why this case and the charge itself relates to disparate treatment, not hostile environment. What's the definition of a hostile environment? Well, I'll use a definition that came out of a recent U.S. Supreme Court decision, the Morgan case, which states that the workplace must be permeated with, quote, discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. That's the definition. It's not even referenced, Your Honor, Your Honors, in the findings of conclusions of law of the agency. The word hostile environment or the words hostile environment doesn't exist. The words harassment don't, aren't there. And I'm not suggesting that there's some sort of talismanic requirement that it be there. But the fact that there's nothing in there about that other than a finding that, yes, they believe that there were other instances of discriminatory treatment, of disparate treatment. What language again about discrimination in your definition of hostile environment? A workplace permeated with discriminatory intimidation. Why isn't what Judge Fletcher read equivalent to that, discriminatory intimidation? I believe, Your Honor, and I'm sorry, I don't have a photographic memory. I didn't catch every part of the quote. But I believe the language had to do with discriminatory treatment. Well, they said the party was given reprimands and suspensions for a variety of work-related offenses. Why isn't that discriminatory intimidation? It's treatment, but that doesn't mean it's not the way you described a hostile environment, does it? Your Honor, if there's some sort of overlap or blend at some point at which discriminatory treatment becomes hostile environment, I'll yield on that subject, Your Honor. But from the case law ‑‑ I'm not trying to make you yield. I just listened to the definition that you gave me, and it used the word discrimination. And it also uses the words ridicule, insult, and sufficient and pervasive to alter the conditions of the victim's employment and create an abusive working environment. I believe, Your Honor, that Much like what Judge Fletcher just read. You know, if you have a supervisor looking over your shoulder for every little thing you may be doing, that's pretty intimidating. Well, Your Honor, it is our position that had that issue been before the agency in the form of a hostile environment or even harassment, we would have heard about it by now. And why do you say it wasn't before then? Because of the way it was titled? It was not in the charge. The charge itself, Your Honor, specifically talks about one thing. It talks about human discipline, whereas in your view, hostile environment has to do with what you have to endure. Even though you're not being disciplined, you have to endure on a daily basis. Exactly. Hearing epithets, having your fanny pack, not in this case, but, you know, stuff like that, looking at Certainly in the context of the environment That's the distinction you're drawing. That is the distinction you're drawing. What they looked into, just to understand your position, What they looked into is a question of whether discipline or supervisory conduct or the kind of conduct that higher-level employees take vis-a-vis lower-level employees, whether that was discriminatory. And the charge of hostile environment has to do with conduct of fellow employees. Nothing to do with disciplining. That is the distinction, if one has to draw a bright line, yes. And Your Honor asked me for an example of what wasn't investigated. An example that we heard from plaintiff's counsel today was this allegation that coworkers were making disparaging, insulting remarks about Hispanics in the presence of Gene Johnson, I believe. Again, there's nothing in the underlying EEOC, excuse me, ACRD investigation that addresses that, suggests that it was even raised. That's what I'm talking about, there being a distinct absence, a void. And again, if Judge Fletcher's analysis here addresses multiple instances of discriminatory treatment, if that becomes an issue of hostile environment, then I believe we have a new standard for hostile environment. But I don't even believe if there was such a creature in this particular case, given the facts that we actually have before the court, that we would have such conduct. Start off on what all the implications are of what we're talking about. The district court ruled what with respect to exhaustion? The district court ruled that there was no hostile environment claim raised, excuse me, properly before the court, that it jurisdictionally didn't have that, wasn't there because of the fact that it was not exhausted below. That leaves for the court or left for the court an issue of discrimination in the form of her termination, period. Leaves before the court what? The question of whether or not the plaintiff was terminated on the basis of her race or national origin. In light of this ruling, many of the factual disputes raised in this case are not at issue because the disputes relate to plaintiff's unexhausted claim of racial harassment. Was that a mistake? I'm sorry, Your Honor. I said that her claim of racial harassment is unexhausted. I believe it would be then, yes. That's a mistake. Well, it's technically not a mistake because what I'm saying is, Your Honor, I did. So the district court's on a bad footing right here. Maybe I'm not following, Your Honor, but let me see if I can address the issue here. What I'm saying here, Your Honor, is he says, as far as I read it, I'm not going to look at anything involving claims of racial harassment or a natural, I'm only going to look at unlawful termination due to national origin. Yes, Your Honor, that is correct. What I'm simply saying was there seems to have been, because this case shifted from a national origin case to a race case, it started out as national origin at the charge level. Over time, if one looks at the findings, race creeps into the discussion because of the word Hispanic versus Mexican. If we rule against you on the exhaustion issue, what does that mean with respect to what we have to do now with the case? If you rule, if the court rules against us on the exhaustion issue, then we are remanded back to the trial court to have a trial or further discovery on the question of whether hostile environment on the basis of race and or national origin existed. And what we're simply saying, Your Honor, is if the two, race and or national origin harassment, which factually there has been nothing to suggest that there's a distinction here, that's all I'm saying and that's all I said at the beginning of our argument was we're not making that distinction. The distinction that we're making is between hostile environment conduct and discrimination on the basis of her termination. That's the distinction that's being made. That's the distinction the court essentially made by finding summary judgment on that basis. Let's spend a little time talking about the question of punishment given other employees for similar or arguably similar conduct. Do you want me to address the other instances that the plaintiff tries to compare herself to, Your Honor? Is that? Yes. Well, it really comes down to a question of comparing the specific instances and. What about the one she mentioned, the woman who. This is Russell. Oh, Tonette Russell. The mortal assistance account. Well, I think there are some very distinct and pertinent distinctions between her situation and the plaintiff's situation. In the case of Tonette Russell, there was no falsification of records, none, except according to the plaintiff, the plaintiff says that Tonette Russell, or she observed it or heard it from Tonette Russell that she saw it happening. What's interesting is that the employer didn't know about it. The way the employer found out about it was about the alleged falsification of records on the part of Tonette Russell. The way that the employer found out about that alleged falsification was after the plaintiff complained to the Civil Rights Division and notified the Civil Rights Division that she was aware of it, that it was going on. At her deposition, she was asked about it, and she admitted that, yes, she knew about that conduct going on, but that she didn't tell the employer about it. So now she wants the court to somehow compare her conduct to Tonette Russell's conduct when the employer didn't know. What did Russell do? What the employer knew about at the time she worked there. What did Russell do? Well, according to the plaintiff, because she's the only alleged witness. Forget all the nonsense. What did Russell do? That's the question. What Russell did was, was that she, she, she, just a moment, Your Honor. She granted a credit extension to her sister. She redeposited a return check, and she canceled a collection action for her sister, none of which involved falsification of records. It's un- An obligation to the company, right? For a period of time, apparently she did, yes. But it did not involve a falsification of records. There was no evidence that she hid anything from anyone. It was a different device for accomplishing the same result. Anyone, somebody not to pay an obligation. Well, I suppose if one went to a bank and used a bank card to get money, and one robbed the bank, there would be two different ways of accomplishing the same result. I wouldn't, I wouldn't put the same weight or the same moral implications on that vehicle. How did what, what plaintiff here did, how did it differ? There is no- You had some dispute during the argument. Tell us- There's no evidence in the Russell case that Ms. Russell did anything that- Why don't you tell us what she did, what plaintiff did. You've told us what Russell did. Now tell us what plaintiff did. What the plaintiff did was that she had opened this account through Mr. Toledo in June of 1994. She then, in approximately a month and a half later when Mr. Toledo called her and asked for an extension to pay at the same time that she, he, he asked her to change the first initials on his name. Then there was a couple more weeks went by, no further payment took place, and at this point someone purportedly, Mr. Toledo called again and this time asked for a further extension, and it was during that further extension that the plaintiff went in and changed the last name on the account and changed the address on the account, and then also notated that the individual was going to seek help from the Tucson Urban League, which was, there was some shorthand for that, which effectively meant that the individual was destitute and needed the money. Now this was an individual, and it's undisputed, who was a college basketball coach for the local community college in Tucson. What do you think the purpose was in doing all of this? To help a friend. By? By, by, by changing the records, by making it impossible to catch up. What would have been the net effect had she gotten away with it? What would have, we, you've told us what would have happened with Russell, so she gave an extension and presumably that loan would become due, eventually it would catch up. What would have happened in this case if everything she did had? There would have been nonpayment on the account by anyone. How's that different from Russell? Ultimately, Russell, the issue in Russell, as far as we know from this record, from what we know, because it's all based on the testimony of individuals, was that she prolonged the payment, but it eventually would have been paid. Eventually they would have gone after the right person. Correct. And either they would have gotten a judgment or they would have filed bankruptcy, whatever it is the consumer is doing. That's correct. Okay. What would have happened in this case? Let's say eventually she made all these changes to the account and then eventually this was not paid. What would have happened? There would have been no skip tracing, contrary to what the plaintiff will tell you, because of the nature of these kinds of collections. But she made changes in the name and the address. They were still significant. And there's another fact here, Your Honor, and this is not a fact that I'm raising. So they would have then, what you're telling us, they would have gone after somebody who didn't exist. Correct. Based on what this record showed, the name was wrong, the address was wrong, there was no forwarding address. That was another thing that the plaintiff failed to do here. When she closed the account, she should have created or added to the file a forwarding address. She didn't do that either. Social Security number? And that was the additional fact I wanted to add. The Social Security number was false from the word go. The plaintiff was not accused of having put it down falsely under the circumstances the person who opened the account may have given her a false address, I mean, excuse me, a false Social Security number. But that's undisputed as well that it's also incorrect. So in this particular case, it would have been impossible, not impossible, that's not true, it would not have been impossible, but given the normal circumstances in which collections are made and given the volume with that information and according to the undisputed record from Ms. Huggins, there would have been no further collection and the matter simply would have been written off. That's the difference. Thank you. Thank you, Your Honors. There was a lot of discussion about Tonette Russell and what she did as compared to the plaintiff. Another comparator that we have that is significant is Kara Bowden, and Kara Bowden falsified meal tickets for reimbursement, and she was a non-Hispanic who was suspended for 12 hours for defrauding the company, and that's what her reprimand says, you defrauded the company. Defrauding the company for what? Falsifying meal tickets, getting paid for meals she didn't eat, didn't have. She just wrote off the slip so she could get the check. Do you think that's the same as falsifying an account? I don't think it is, but, well, I think it's similar. If you categorize it as fraud, which the defendant does, defendant says this is unlike Tonette Russell because it's fraud, it's changing the account. Well, Kara Bowden was reprimanded for fraud. She wasn't fired. She was given a written reprimand by the same supervisor who terminated Encinas, Vicki Valadez. And she also went one step further, by the way. She taught other employees how to defraud the company in addition. Well, let's tell you, neither of those examples strike me as anywhere near as egregious. I mean, I've listened to the explanation, and, you know, extending the credit for the sister, you know, it's bad, right? It's bad, but it's at least when all is said and done, they still go after the sister. They still have a human being. And, you know, meal tickets, you know, I don't know. It just doesn't strike me as being nearly as egregious. This is what they do. If they can't go after their customers for payment of the fees or the charges for the parlor, you know, they're going to go into business. This is their lifeblood. And having employees go in and make it impossible to collect, not just delay a little bit, which is bad enough, but actually sort of create a brick wall to make a collection so difficult as to be practically impossible, just strikes me as far worse. It's true. I agree with you. Although the issues of what actually happened on that Toledo account are in dispute. Part of the record indicates that they called Mr. Toledo and said, did you tell NC to change your initials? And he said yes. Did you ask her for a credit extension? And he said yes. So part of what happened with that account are in dispute. I don't understand. How does the fact that he asked for these things help your client? Because she wasn't doing it just to help a friend. She did it because the person who had opened the account. She's not supposed to be working on that account at all. No, she was authorized to work on that account, Your Honor. She's not supposed to not work on friends' accounts? She's authorized to be working on accounts. That was her job. This particular account was opened by Andrea Martinez's father, Mr. Toledo. Andrea, she knew who he was, yes. She knew it was his father. But so the question is the intent. What is her intent? And there's issues of fact on that. How did the address get changed? How did the address get changed? She testified that she scrolled through the screen and changed the address by accident. It was a typo. Accident? That's her testimony. There are certain things that don't even pass the straight face test. Well, in addition to what happened on the Toledo account, she was fired for two reasons. And her termination memo says that explicitly. Because of her poor work history. She agrees that she had an absentee problem. Right. She admits that. She took days off after she asked for them. That's true. She took them anyway. That's true. And the cumulative evidence in this case, though, however, shows much testimony that Hispanics were routinely tracked for absenteeism more than non-Hispanics. And they were disciplined more often and more severely for tardies and the rest and all other discipline. The cumulative evidence is what the court used to look at. And under Lyons v. England, the court indicates that the cumulative evidence taken together can show discriminatory animus on the issue of pretext. Kristen Sinas has waited nine years for her day in court. She was fired in 1994. We respectfully request the court to reverse the trial of the court and grant her her day in court. What happens in your view if we agree with you that the exhaustion was not a problem? What then? Then the – well, it depends. I would hope it would go to trial, but – What should we do in your view if we agree with you on the argument that it was exhausted, the hostile environment was exhausted? What should you do? If you reverse the trial court and agree that hostile environment was exhausted, then I would – the evidence would indicate that there is hostile environment in this case based on all the evidence. For what? I'd like you to send it back for trial. Quick question. What do you want us to do if you win? I'd like you to reverse the trial court and to send it back for trial. On? On all issues, the issue of exhaustion for race discrimination, hostile environment, and the issue of pretext. And for – if you find that the hostile environment was exhausted, it's the same evidence. It's the same evidence presented as in the discrimination case, but the trial court already took a look at. And I believe that evidence shows hostile environment. So you just think the same evidence is already there. The district court just has to run it through a different filter. That's right. And this time the district court shouldn't make the mistake of not granting inferences in the plaintiff's favor, which is what the district court did. The district court took the wrong approach and looked at evidence without giving the plaintiff the benefit of all reasonable inferences. Thank you. Case is argued. We'll stand some minutes.
judges: B.fletcher, Kozinski, Trott